OPINION OF THE COURT
Andrew G. Tarantino, Jr., J.
Nature of the Case
This case was transferred from Supreme Court to this trial court pursuant to Civil Practice Law and Rules § 325 (d). Plaintiff husband and wife were prospective purchasers of real property on Long Island. The seller, in foreclosure, entered into the residential contract of sale. The purchasers were denied their mortgage upon the grounds of insufficient income. They seek return of their down payment. Purchasers also seek judg *343 ment for treble damages claiming that the seller improperly converted the down payment. Seller believes that the purchasers violated the terms of the contract. There is no dispute that the down payment has been held in escrow since 2005. Nor is there a dispute about the residential contract of sale and attached rider. The seller believes that the purchasers failed to make prompt application for the mortgage, lied on their mortgage application, and did not make application to an approved institutional lender. A one-day bench trial was conducted taking testimony from each purchaser, and the seller’s wife.
The Facts
The parties entered into a residential contract of sale in August 2005. The purchase price was $1,221,000, with a down payment of $61,050. No one understood why the contract had a typed date of July 27, 2005. Purchasers testified that they received the contract August 1, 2005, signed it, and returned it to their attorney with the down payment check dated the same. The seller subsequently signed the contract. Seller’s wife testified she personally delivered the contract to purchasers’ attorney about August 6, 2005. Neither the purchasers, nor seller, actually dated the contract adjacent to their signatures, nor were any transmittal letters submitted to the court. In contrast to the seller’s wife’s recollection, purchasers stated they were not able to send the final contract to E-Trade until about August 29, 2005. The E-Trade checklist, dated August 29, 2005, requested a copy of the contract. Unbeknownst to the purchasers at the time they signed the contract, the property was in foreclosure (Suffolk County index No. 1267/2005).
The contract provisions, as they relate to the issues raised, are as follows:
Mortgage commitment contingency (1i 8):
“(a) Obligation of purchaser to purchase under this contract is conditioned upon the issuance on or before 30 days after a fully executed copy of this contract is given to purchaser or Purchaser’s attorney in the manner set forth in If 25 or subparagraph 8 (j) (the ‘commitment Date’), of a written commitment from an Institutional Lender pursuant to which such Institutional Lender agrees to make a first mortgage loan, other than a VA, FHA or other governmentally insured loan to Purchaser at Purchaser’s sole cost and expense of $975,000 for a term of at least 30 years.
*344 “(b) Purchaser shall (i) make prompt application to one or, at Purchaser’s election, more than one Institutional Lender for such mortgage loan, (ii) furnish accurate and complete information regarding Purchaser’s and members of Purchaser’s family, as required, (iii) pay all fees, points and charges required in connection with such application and loan, (iv) pursue such application with diligence, and (v) cooperate in good faith with such Institutional Lender(s) to obtain a Commitment. . .
“(d) If all Institutional Lenders to whom applications were made deny such applications in writing prior to the Commitment Date Purchaser may cancel this contract by giving Notice thereof to seller, with a copy of such denials . . .
“(f) If this contract is canceled by Purchaser pursuant to subparagraphs 8 (d) or (e), neither party shall thereafter have any further right against, or obligations or liabilities to, the other by reason of this contract, except that the Down payment shall be promptly refunded to Purchaser and except as set forth in paragraph 27 [1Í 27 refers to brokers, not applicable in this case] . . .
“(i) For purposes of this contract, the term ‘Institutional Lender’ shall mean any bank, savings bank, private banker, trust company, savings and loan association, credit union or similar banking institution whether organized under the laws of this state, the United States or any other state, foreign banking corporation licensed by the Superintendent of Banks of New York or regulated by the Comptroller of the Currency to transact business in New York State.”
Seller’s representations (1f 11):
“(a) Seller represents and warrants to purchaser that:
“I. . . .
“II. Seller is the sole owner of the Premises and has the full right, power and authority to sell, convey and transfer the same in accordance with the terms of this contract.”
Closing date and place (1f 15):
“Closing shall take place at the office of Robert H. at 10 o’clock on or about 09/01/05 or upon reasonable notice (by telephone or otherwise) by Purchaser.”
Contract rider (1f 4):
*345 “This contract is subject to a [sic] conditioned upon the PURCHASER obtaining within 45 days of the date hereof, a conventional mortgage loan in the amount of $975,000 at a prevailing rate of interest for a period of more that [sic] 25/30 years.”
Contract rider (H 5):
“PURCHASER agrees to make immediate application of mortgage loan and to truthfully and promptly sign all papers in connection herewith. If PURCHASER shall be unable, after diligent efforts, to obtain said commitment within said period, then either party, by written notice to the other, may cancel this Contract and the down payment shall be refunded to the PURCHASER and this contract shall become null and void with no liability to the other party.”
Contract rider (1114):
“The PARTIES agree that any notices that may be required under this Contract may be given to the respective attorney’s [sic] herein.”
The purchasers resided in Orange County, New York. The wife, a doctor, left her employment in May 2005; she accepted a new position in Long Island to begin September 1, 2005. They narrowed their search to this particular area because the school district offered excellent services they required for their special-needs child. They placed a bid on the premises sometime that June. When no response was received after a couple of weeks, they increased their offer over $100,000 which was accepted. The above contract was then exchanged. The purchasers impressed upon the seller their urgency to move into the premises by. September 1, 2005, both for the start of the wife’s new position and for the child to begin in the new school district. The purchasers had not been made aware that the property was in foreclosure.
After signing the contracts, the purchasers ordered the title search. They also began the mortgage process by reaching out to a mortgage broker named Mr. Romano, E-Trade Mortgage Corporation (E-Trade) and HSBC. Romano, based upon the financial documents given him by purchasers, prepared a mortgage application for their review. Purchasers were informed that Romano’s estimated closing costs would be $23,000. That good faith estimate was admitted into evidence, together with the application prepared by Romano reflecting the wife’s pro *346 spective employment. The purchasers asked if Romano could match the $14,000 closing costs estimated by E-Trade. When he could not, the purchasers continued with the E-Trade application, and paid $1,000 to be applied later to costs. Purchasers then provided E-Trade with the pay stubs, tax returns and other documents requested by E-Trade. Purchasers had not yet provided the 401-k statement. On both the application for Romano and E-Trade, the purchasers indicated that the wife ceased her prior employment in June 2005, and that she was with the new employer “0” years. Effectively, the wife was unemployed at the time of the application. The husband testified that E-Trade told him to place the wife’s prospective employment on the application so that it could consider the purchasers’ additional income. The E-Trade Truth-In-Lending disclosure reflected the amount financed as $970,457 after applying prepaid charges of $5,543 against a loan of $976,000. The E-Trade documents, entered into evidence, provided that “this agreement is to be governed by, and construed in accordance with the internal laws both substantive and procedural of the Commonwealth of Virginia without regard to conflict [of] laws principles.”
It was in mid-August that the preliminary title report reflected the foreclosure action against the premises. Meantime, the seller’s wife was obtaining payoff letters from each of the seller’s debtors. As indicated in voice mail transcripts submitted into evidence, the payoff letters were not all submitted until about September 13, 2005.
Seeing what would be delays, purchasers asked the seller whether they could take early possession of the property. The wife’s job was beginning September 1, 2005, the seller was still obtaining payoff letters, and the mortgage application was still pending. Seller’s wife said, “we’ll see,” and weeks passed without a response to the purchasers. The wife began her new job September 1, 2005. She commuted 100 miles daily from Orange County to Long Island. Occasionally, she would be able to stay with friends. However, overall, the commuting interfered with her new position and she was terminated about the second week of September 2005.
E-Trade Mortgage Corporation denied the purchasers’ application in writing dated September 13, 2005. The stated reason for denial was “income is insufficient for the credit requested.” The seller’s wife, in a voice mail to the purchasers on September 19, 2005, stated, “I just heard from my attorney that you got declined.”
*347 The purchaser wife subsequently obtained new employment in December 2005, and the purchasers bought a new home in June 2006 mortgaged through E-Trade Mortgage Corporation.
Analysis
This case reflects the pitfalls when parties enter into an agreement which is impacted by too many outside influences. First, the seller was in foreclosure which created its own delays and urgencies. Seller needed the cooperation of debtors, and their foreclosing lender, to obtain timely payoff letters. Seller needed to sell the premises to avoid the foreclosure sale. Next, purchasers needed to take possession before September 1, 2005, because of the wife’s new job. The purchasers also needed to enroll their special-needs child in the school district to begin services. The parties entered into a contract providing for closing to occur in less than 30 days, while involving a mortgage application process which was not due until about September 20, 2005, based upon the dates final contracts might have been delivered.
The contract provisions are undisputed. There is little dispute about substantive facts. The discord arises from the parties divergent interpretation of the law and facts. The issues before the court are:
(1) Did the purchasers make a good faith and prompt application for the mortgage?
(2) Did the purchasers apply for the proper mortgage amount?
(3) Was E-Trade an “institutional lender” as defined by the contract?
(4) Was the seller prohibited by the foreclosure from selling the premises?
(5) Did the seller convert the down payment upon his refusal to refund it to the purchasers?
In a matter such as this, it is the province and indeed the obligation of the trial court to assess and determine matters of credibility. (Morgan v McCaffrey, 14 AD3d 670 [2d Dept 2005]; Matter of Liccione v John H., 65 NY2d 826 [1985].) Here, the burden is upon the plaintiff to plead and prove its direct case by a fair preponderance of the credible, relevant and material evidence with the same burden imposed upon the defendant respecting his claim against the plaintiff. (Prince, Richardson on Evidence § 3-210 [Farrell 11th ed]; Torem v 564 Cent. Ave. Rest., 133 AD2d 25 [1st Dept 1987].)
The court credits the testimony of each purchaser. The seller’s wife testified by scant recollection that she personally delivered *348 the final contracts to the purchasers’ attorney sometime between August 1 and 6, 2005. The purchasers described their ardent desire to purchase this specific house located in a school district which would provide necessary services to their special-needs child. After receiving no response to their initial bid, they increased the bid an additional $100,000 which was ultimately accepted. The court notes that the purchasers had total assets in excess of $1,000,000, with an estimated net worth over $600,000. It is also clear from the testimony that almost immediately after signing the contracts the purchasers reached out to Romano, E-Trade and HSBC for mortgage information. Purchasers provided Romano with financial documents sufficient for Romano to prepare a mortgage application for the parties. Not dissuaded from buying the house because of Romano’s high closing costs, the purchasers then immediately continued their application with E-Trade. There was nothing to the contrary that purchasers were prompt in their actions, and acted in good faith.
The seller argued that because the purchasers applied for a $976,000 mortgage when the contract provided for a $975,000 mortgage, that purchasers breached the contract. The husband explained that he paid $1,000 to E-Trade with the application which was then, as indicated by the E-Trade documents, to be applied at closing as a credit to the mortgage. Thus, the $976,000 mortgage was $975,000. Further, after costs would be paid by purchasers, the Truth-in-Lending disclosure reflected the actual amount financed would have been only $970,457. Purchasers’ application was for a proper mortgage amount.
The seller next argued that the purchasers had the burden to prove that E-Trade was an “institutional lender” as defined in the contract. The court finds to the contrary. The E-Trade agreement stated that it was to be governed by the laws of Virginia. E-Trade furnished the purchasers with all Truth-in-Lending disclosures, good faith estimates, and other documents, customarily provided by mortgage lenders. Lastly, purchasers mortgaged their subsequent home through E-Trade. Each of these facts met the burden and presumption that E-Trade met the definition of an “institutional lender.” At that point, however, the burden shifted to the seller to convince the court otherwise. Other than the bare allegation, seller provided no proof to the contrary. A point bearing comment here is that the court did not rely upon any facts outside the record in reaching its conclusions. That is, each fact sustained is drawn from the *349 submitted documents. However, from the bench in open court the court informed counsel that, on the Internet, E-Trade was an FDIC insured lender. The court provided each attorney an opportunity to address the validity of this information as it related to the issue. One wonders whether seller would have posed the same “argument” if the purchasers applied to Citibank, or a local federal credit union? The court asked seller’s counsel if he had a basis in law and fact to assert such an argument. (See Rules of Professional Conduct [22 NYCRR 1200.0] rule 3.1 [“Non-meritorious claims and contentions”].) Seller did not prove any information to the contrary. Nevertheless, under (our) system of adversary litigation,
“the task of furnishing evidence rest[s] solely upon the parties, neither the judge nor the jury having any obligation or duty in this regard.
“As a general rule the party who has the burden of pleading a fact also has the burden of producing evidence and of persuading the trier of fact . . . But this general principle does not apply in all situations. The burden of proof is sometimes said to be not upon the party pleading the fact but upon the party having peculiar knowledge of the proposition or upon the party having the affirmative of the issue. And in some instances the opponent has the burden of proving the negative of a fact alleged by the proponent.” (Fisch, New York Evidence § 1087, at 610-611 [2d ed].)
In this case, the burden of proving that E-Trade was not an “institutional lender” shifted to the seller which he ignored.
Purchasers argued that the foreclosure action created only an equity interest in the premises for the seller and, therefore, seller could not sell the property. It has long been the law in New York that the consummation of a public auction of a property in foreclosure extinguishes all equity of redemption. (Nutt v Cuming, 155 NY 309 [1898].) The interests of the parties become barred and foreclosed, not upon the entry of the judgment, but upon the sale and conveyance of the land. (Id.) In this case, the foreclosure sale had not yet been held. The seller was not prohibited from selling the premises. However, the court opines that the seller had an affirmative duty to disclose to the purchasers that the property was in foreclosure. Implicit in the seller’s representations is that he has clean title which surely is clouded by the foreclosure action. If for nothing more than alerting the purchasers that there may be additional delays caused *350 by the involvement of the foreclosure when, as here, the purchasers made it clear that they needed possession by September 1, 2005. Whether the seller entered into this arrangement with “unclean hands” is not at issue.
There also is no merit to the purchasers’ conversion argument. This was a real estate contract dispute and the down payment has been maintained in escrow. It was not converted by the seller for personal use.
The last issue is analysis of the actual mortgage denial. Testimony revealed that the purchaser wife was employed beginning September 1, 2005, but terminated about the second week that month. The denial was based upon insufficient income. The denial letter does not state whether the insufficient income was based upon the purchasers becoming a one-income family again (after the wife’s termination), or because the combined income (had the wife remained employed) was insufficient. In either case, the denial would have been issued without any intentional act by the purchasers to undermine the mortgage. In the former, purchasers were a one-income family when the contract was signed. When the application was reviewed, they would still have been a one-income family with, clearly, insufficient income to maintain the requested mortgage. In the latter, the prospect of the wife’s additional income, when added to the husband’s, still would have been insufficient to maintain the mortgage. The wife’s two-week employment may have been an occurrence, but not an intervening factor in the mortgage denial. The contract provided that if the purchasers were denied a mortgage commitment, then the purchasers could demand return of the down payment. Seller’s wife admitted that by their attorney they were made aware of the denial contemporaneously with its issuance by E-Trade. Demand was made for the down payment which seller refused to refund.
By reason of the foregoing, it is adjudged that plaintiffs Anand Nambiar and Seema Nambiar made prompt and diligent efforts to obtain a mortgage commitment in August 2005; and it is further adjudged that plaintiffs Anand Nambiar and Seema Nambiar applied for a proper mortgage within the bounds of the contract; and it is further adjudged that defendants George Alexander and Juanita Alexander did not convert the down payment for their personal use as the money has been maintained in an escrow account; and it is further adjudged that defendant Juanita Alexander is not a proper party to this action as she did not sign the contract or rider, and was not a titled owner of the *351 subject premises; and it is further adjudged that defendant George Alexander had the lawful right to enter into the contract and sell the premises because no foreclosure sale had yet occurred; and it is further ordered that judgment be awarded in favor of plaintiffs Anand Nambiar and Seema Nambiar and against defendant George Alexander in the amount of $61,050 together with interest thereon from October 1, 2005, calculated based upon one of the following: (1) if the proceeds have been in an interest bearing account continuously since October 2005, then the interest shall be that which has accrued in that account, or (2) if the proceeds have not been in an interest bearing account then interest shall be calculated at the rate of 3.6% which is based on the reported average interest of certificate of deposit accounts; and it is further ordered that defendant George Alexander shall notify the defendants Shakuntala Persaud and Robert Hanoman Esq., in writing, within 10 days of the date of this order to refund the down payment to the plaintiffs, and upon release of said down payment, Shakuntala Persaud and Robert Hanoman Esq., who were named defendants as stakeholders and escrow agents, shall be relieved from further liabilities in this action.